BANK OF TIPTON, Appellant, v. ADAIR et al.

Division One, February 18, 1903.

1. **Fraudulent Conveyance:** DEED TO WIFE: PRESUMPTION. If the facts fully disclose where the consideration which purchased land deeded to the wife came from, there is no room for presuming that it came from the husband.

2. ——: ——: ——: HUSBAND AS AGENT. A wife has the right to employ her husband to act as her agent in the purchase of land for her, with or without compensation, and he has the right to so render such service.

3. ——: WIFE'S EFFORT TO OBTAIN HOME: HUSBAND AS AGENT. Heirs to a tract of a thousand acres of land generously fell in with the plans of a wife, who had been kind and good to them in their infancy, to obtain for herself a home in her old age. She conceived the idea of getting an option in the land and selling a part of it for enough money to pay for the whole, and when she, and her husband and sons, acting for her without compensation, found some purchasers for parts of it, the attorney in fact for the heirs made her a low price for the whole, and made deeds directly to the purchasers for the pieces negotiated by her, and deducted the amounts of their payments from the aggregate price for the whole tract, and entered into a written option for the sale of the balance within three years on payment of the balance of that purchase price which remained unpaid, but, being a citizen of Iowa and not familiar with the laws of Missouri concerning married women, he drew up the option contract with her husband as the second party, and her name did not appear therein. Afterwards she made the payments as agreed to in this option, and the attorney in fact made her a deed, and the husband's creditors are seeking to have that deed set aside as in fraud of their rights. He was at the time insolvent, and none of his money or estate went into the property, and none of his indebtedness was ever incurred upon the faith of his ownership of the land. *Held, first,* that the affection for her by the heirs was the valuable consideration for the title to the property; *second,* the fact that the husband rendered the wife, free of compensation, services in securing purchasers for parts of the land at an advance over the option price, can not render the deed to her fraudulent as to his creditors; *third,* the deed can not be set aside as being in fraud of their rights.

Appeal from Morgan Circuit Court.—*Hon. Jas. E. Hazell,* Judge.

AFFIRMED.

*W. M. Williams* and *J. W. Jamison* for appellant.

*John D. Bohling* and *A. L. Ross* for respondents.

BRACE, P. J.—By general warranty deed, dated October 15, 1897, and on the same day duly acknowledged and recorded in the recorder's office of Morgan county, Sarah H. Payne, Jacob A. Payne, B. W. Payne, Sarah M. Cresap, S. P. Cresap and M. M. Payne, by their attorney in fact, George E. Draper, conveyed a tract of land containing 322.78 acres situated in said county to the defendant, Mary J. Adair.

On December 17, 1898, the plaintiff obtained judgment against her husband, the defendant P. D. Adair, for the sum of $2,743.90, execution on which was duly issued and levied on all the right, title and interest of said P. D. Adair in and to 240 acres of said land so conveyed to the said Mary J. Adair, and at the sale duly made under said execution, the plaintiff became the purchaser thereof, and received a sheriff's deed therefor dated April 21, 1899, and thereafter on November 7, 1899, instituted this suit, alleging in the petition that the said P. D. Adair was on October 15, 1897, insolvent and largely indebted to the plaintiff; that on that day he became the purchaser, for a good and sufficient consideration, of the following described portions of said land so conveyed to the said Mary J. Adair, and included in said sheriff's deed, to-wit: "the southeast quarter of the southwest quarter of section thirty-one, in township forty-four, of range seventeen; and the southeast quarter of the northwest quarter, and the south thirty acres of the southwest quarter of the northwest quarter of section five, and the east half of the northeast quarter of section six, in township forty-three, range seventeen." That with the intent and for the purpose of defrauding the plaintiff, and preventing it from collecting the amount due and owing it by the said P. D. Adair, he caused the deed aforesaid to said real

estate of date October 15, 1897, to be made to his wife and co-defendant the said Mary J. Adair, without any consideration moving from the said Mary J. Adair therefor, she well knowing his fraudulent design and purpose, and consenting that the deed be so made for the purpose of aiding and assisting him in said fraudulent scheme. That defendants are in possession of the premises, and praying that the said Mary J. Adair be divested of the title to said described real estate, that the same be vested in plaintiff, that plaintiff have possession of the lands, and for general relief.

The answer of defendant P. D. Adair is a general denial. The answer of Mary J. Adair denies all the allegations of fraud in the petition. Denies that her co-defendant P. D. Adair either purchased or paid for the land, and avers that on or about March 3, 1897, she purchased from George E. Draper, attorney in fact for Sarah H. Payne and others, the land described in the petition, and received the deed therefor on or about October 15, 1897; that she bought and paid for said lands, and executed her obligations therefor, and that the same was done in good faith and for her own use; says that the said sheriff's deed is a cloud upon her title, and prays that the same may be declared null and void, and for general relief.

The court found the issues for the defendants, granted the affirmative relief prayed for in the answer of defendant Mary J. Adair, and rendered judgment against the plaintiff for costs, and the plaintiff appeals.

The grantors in the aforesaid deed to Mary J. Adair of October 15, 1897, were the widow, heirs at law and devisees of Moses U. Payne, late of the State of Iowa, deceased, of whose estate the said George E. Draper was administrator, with the will annexed, as well as attorney in fact for said widow, heirs and devisees, all of whom were residents of the State of Iowa. The consideration expressed therein is twenty-one hundred and twenty-three dollars, and other valuable considerations; and on the same day the said Mary J. Adair and her husband, the said P. D. Adair, executed

and delivered to the said George E. Draper their five promissory notes, of even date therewith, for said sum of $2,123 payable to him, one for $323 on March 1, 1898, one for $450 on March 1, 1899, one for $450 on March 1, 1900, one for $450 on March 1, 1901, and one for $450 on March 1, 1902, and also the following written obligation:

"Versailles, Missouri, October 15, 1897.

"For good and valuable consideration it is agreed by and between Mary J. Adair and P. D. Adair, of Morgan county, Missouri, of first part, and George E. Draper, of Fremont county, Iowa, of second part, that in event that S. F. Bowman, Bruce or A. J. Vogt, or either of them, should fail to pay balance due said George E. Draper on lands purchased and secured by deed of trust on the lands purchased of Payne heirs, and said trust deeds, or either of them, should be foreclosed and the property sold should fail to pay the amount then due and unpaid of principal, interest and costs, then and in that event we are to pay said George E. Draper such deficiency as so remains unpaid.

"MARY J. ADAIR.

"P. D. ADAIR."

And to secure the payment of said notes and the performance of said written obligation the said Mary J. Adair and her said husband executed and delivered to said Draper a mortgage or deed of trust on said lands so conveyed to her, of even date therewith, which on the same day was duly acknowledged and recorded.

The evidence tends to prove that the said Moses U. Payne for many years prior to his death was the owner of a tract of land containing about one thousand and seventy-five acres in Morgan county. That the said P. D. Adair for a long time had been a tenant of his, living on a portion of said land, and exercising to some extent supervision over the remainder for him. That at one time the said Payne was the owner of another, smaller tract of 60 or 100 acres, which he had conveyed to the said P. D. Adair in trust for the benefit of Mr. and Mrs. Tipton, parents of his wife, the said

Mary J. Adair, for whom and her family he and his family seem to have entertained a kindly and benevolent feeling. That the said Moses U. Payne died some time in the year of 1895. That afterwards Mrs. Adair, in view of the friendly feeling entertained for her and her family by the Paynes, conceived the idea that they might be willing to sell her their lands in Morgan county at such a price as would enable her by selling the greater portion thereof at an increased price to other parties to retain some part thereof for a home. This idea she communicated to her family, at a reunion of its members at her home in the summer of 1896, and requested their co-operation, to which they all readily assented. Thereupon negotiations were commenced with Mr. Draper, and parties to whom it was thought some of the land could be sold. These negotiations were conducted by her husband, and her two sons Walter and Henry, both of whom were of age, the elder, Walter, being engaged in business in St. Louis, in the course of which it was ascertained that the Paynes were favorably disposed to the scheme, and that S. F. Bowman was willing to purchase 120 acres of the land at $2,200 and M. B. Bruce 400 acres at $4,900, and the negotiations culminated in the meeting of these parties with Mr. Draper at Versailles, in Morgan county, on March 4, 1897, where and when it was finally agreed that Mrs. Adair should have the whole tract for $13,000 and should be credited with the amount of such sales thereof as should be made to other parties and approved by Mr. Draper, the deeds to such parties to be made directly to them.

In making the agreement Walter Adair acted as spokesman for his mother, who was not present, and it was distinctly stated by him and understood by all the parties that the contract or deal was with her and for her benefit. He directed Mr. Draper to draw the papers accordingly, he being compelled to leave in order to make his train for St. Louis, and Mr. Draper agreed to do so. Thereupon Mr. Draper executed general warranty deeds to Bowman and Bruce severally

for the tract which each had agreed to purchase, as aforesaid. They each made the cash payment thereon required, and executed their several promissory notes for the remainder of the money, secured by several deeds of trust on the land purchased by each, thus disposing of 520 acres of the land, and $7,100 of the purchase money therefor. Mr. Draper then drew and signed a written agreement for the remainder as follows:

"This agreement made this the 4th day of March, 1897, by and between Geo. E. Draper, attorney in fact for heirs and residuary legatees of M. U. Payne, of first part, and P. D. Adair of second part is to witness, that for good and sufficient consideration first party has given second party the option of purchase of the following real estate in Morgan county, Missouri, to-wit: southwest quarter section 5, south half northwest quarter section 5, northwest northwest quarter section 5, northeast quarter section 6 and east half southeast quarter section 6, all in township 43, range 17, and southeast southwest quarter section 31, township 44, range 17, until the first day of March, 1899, upon the following terms, to-wit: Second party is to pay first party, in event of purchase, as purchase price of said real estate, the sum of $5,900. One-fourth of said purchase price to be paid at the time of purchase or on or before March 1, 1899, and balance in three equal annual payments payable respectively March 1, 1900, 1901 and 1902, with annual interest on deferred payments at rate of six per cent per annum payable annually from and after March 1, 1899. In the event said second party shall on or before March 1, 1899, elect to purchase said real estate and pay said Geo. E. Draper the said twenty-five per cent of said purchase price and shall execute and deliver his three promissory notes in amount each one fourth of said purchase price payable at Sidney, Iowa, and bearing interest each at rate of six per cent per annum from March 1, 1899, payable annually, and shall execute and deliver his trust deed to said Geo. E.

Vol 172 mo—11.

Draper on said real estate to secure the payment of said notes, same to be duly and legally executed in usual form thereof, then and in that event said first party shall execute and deliver a deed of said premises in form of warranty deed signed by said first party as attorney in fact for said heirs, to-wit: M. M. Payne, J. A. Payne and wife, S. M. Brunk and husband, and Sarah H. Payne.

"It is further agreed that time is of the very essence of this contract and that the right of the second party to purchase said property as aforesaid shall terminate on March 1, 1899, and in that event first party is entitled to possession and all rights in said premises same as though this contract had not been made. This contract and no other part thereof can be assigned by second only upon consent of first party except that he may assign to his wife in which event his individual responsibility shall continue same as before assignment.

"It is further agreed as part of this contract that first party is to and does hereby lease to second party the aforesaid premises for the period of two years commencing March 1, 1897, and as rental of said premises second party agrees to pay the tax of 1897 and 1898 on said premises and in addition to pay first party the sum of $354 on the 1st day of March, 1898, and the sum of $354 on the first day of March, 1899, and if second party elects to purchase said premises he is to pay tax of 1899 and in event any of said rental aforesaid has not been paid same shall be added to said purchase price.

"Dated March 4, 1897.

"Geo. E. Draper,

"Attorney in fact for widow and heirs at law of M. U. Payne.

"P. D. Adair."

This paper seems to have been drawn after the parties had left except Mr. Draper and P. D. Adair. Mr. Draper was a citizen of Iowa, and testified in behalf of the plaintiff. After testifying that the agree-

ment between the parties was as hereinbefore stated, he was asked why the writing was drawn to P. D. Adair instead of Mary J. Adair and his answer was: "My reason for making it that way was that I was not entirely advised as to how far a married woman might go in contracts. For that reason I wrote the contract in the name of P. D. Adair." Mr. Adair also testified in substance, that after the paper was drawn Mr. Draper gave it to him and requested him to sign it. That he looked over it and told Mr. Draper that it was not drawn according to the agreement and he replied that not being acquainted with the laws of Missouri in regard to married ladies, he had drawn it that way. That it was all right, that he understood the deal was made in the interest of Mrs. Adair, and that the deed would be made to her.

Afterwards 234 acres of the land was sold to A. J. Vogt, for $4,099, and on the 15th day of October, 1897, Mr. Draper executed to him a general warranty deed therefor, he making the cash payment required to Mr. Draper and giving him his notes for the deferred payments secured by a deed of trust on the lands purchased. And on the same day Draper executed the deed of that date in question to Mrs. Adair for the remainder of the lands, the recited consideration therein of $2,123 being the balance of the $13,000 purchase price of the whole tract, with accrued interest, after deducting the amount of the sale to Bowman, Bruce and Vogt. Afterwards Mrs. Adair sold 80 acres of the land deeded to her, to Thomas L. Sparks for $1,746.60, and 50 acres to her daughter, Mrs. Brewer, for $500. So that when the obligations of all the other purchasers have been discharged and the proceeds of these sales applied to the indebtedness, secured by her deed of trust to Draper, that obligation will be discharged, and she will have left 190 acres of the land as her profit on the whole transaction, and this is the land the plaintiff is seeking to recover in this action.

It further appears from the evidence that the indebtedness on which plaintiff's judgment was rendered,

consisted of three promissory notes, signed by W. J. Adair and P. D. Adair, the former a cousin of the latter, one dated September 14, 1896, for $1,500, one dated October 15, 1896, for $600, and one dated November 2, 1896, for $331.20. That this was an indebtedness of W. J. Adair, and that P. D. Adair was his surety. The plaintiff's cashier so testifies, and that at that time P. D. Adair had no property real or personal, and that previous to the Draper deal he never had any property, and the evidence tends to prove that of this indebtedness Mrs. Adair had no knowledge before or at the time she acquired title to the lands in question. That in the fall of 1896, the plaintiff also held another note for $600 signed by P. D. Adair, and W. J. Adair, the date of which is not disclosed, which was for an indebtedness of P. D. Adair, and W. J. Adair was his surety. That sometime during that fall the said W. J. Adair became insolvent, broke up, and left the country. That after Mrs. Adair had acquired title to said real estate, to-wit, on October 28, 1897, she and her husband executed their promissory note, and a deed of trust on these lands to secure the payment of $1,600 to plaintiff, the same being for the amount of said $600 note, and $1,000 that day borrowed by them from the bank, which incumbrance still remains upon the land.

It further appears from the evidence that the Bank of Versailles held two notes of P. D. Adair, one dated August 10, 1896, for $600, signed by him and W. J. Adair, and one dated November 30, 1896, for $210, signed by P. D. Adair alone. That on May 24, 1897, P. D. Adair at the request of that bank executed a mortgage to secure the payment of those notes on all the interest by him held or thereafter to be by him acquired in the tract of land theretofore conveyed to him by Moses U. Payne in trust for the Tiptons as aforesaid, and also all the interest which he then had or might thereafter acquire in the lands described in the written contract of March 4, 1897.

The evidence tends to prove that Mrs. Adair had no knowledge of this indebtedness or of the execution

of this mortgage by her husband until after she acquired
title to her lands, but on February 28, 1898, being re-
quested so to do, she on that day signed and acknowl-
edged that mortgage. She testified that the paper was
not read to her, however, and that she did not know that
it contained her lands bought from Mr. Draper, but
thought it contained the Tipton tract. The evidence
also tended to prove that the preliminary negotiations
with Mr. Draper were conducted by P. D. Adair, who
was personally acquainted, and for that reason was
chosen to conduct the correspondence with him. That
Mr. Draper and the Payne heirs understood, however,
that he was acting for his wife appears from his own
evidence, and that of Jacob A. Payne, one of the heirs
who testified to the intimate relations formerly exist-
ing between his family and the family of Mrs. Adair,
his affection for her mother, who had nursed him when
he was a child, that he wanted to aid her in getting a
home and that he asked Mr. Draper to make the price
and condition as favorable to Mrs. Adair as possible.
P. D. Adair also negotiated the sale to Vogt. The sales
to Bowman and Bruce were negotiated by the younger
son, Henry. The sale to Brewer by her daughter, Mrs.
Brewer, and the deal with Draper was finally consum-
mated by the elder son, Walter, as hereinbefore stated.
The preponderance of the evidence is that these nego-
tiations were conducted, and these several transactions
consummated by these parties as the agents of Mrs.
Adair and for her benefit. That at the time they were
being conducted, and when Mrs. Adair received her
deed, her husband P. D. Adair was insolvent and had
neither money nor estate, and that he was indebted as
hereinbefore stated is established beyond question; that
he was so insolvent and destitute when all of this in-
debtedness was incurred. That not one cent of his
money or of his estate ever went into this property, and
not one dollar of this indebtedness was ever incurred
upon the faith of his ownership of this property or of
any interest therein is equally as well established. The
title to this property is the product of an idea, growing

out of and based upon a sentiment. The idea was Mrs. Adair's. The sentiment was an affection for her upon the part of her grantors. She was the "other valuable consideration" of the grant. She was enabled to realize her idea, in the shape of this property, by the assistance of her husband and her adult children. Can the fact that her husband rendered the service in this behalf, hereinbefore stated, for her without compensation, have the effect of rendering her deed fraudulent as to his creditors? The chancellor held that it could not, and he was clearly right in so holding. There is no room for presumption as to where or from whom the consideration came in this case. The facts in regard to that are fully disclosed by the evidence. Mrs. Adair produced the title to this property, she was the *causa causans* of its existence. Her husband was one of the agencies employed for that purpose. She had the right to so employ him, and to obtain the services which he rendered in the matter either with or without compensation, and he had the right to so render them. "Equity has no jurisdiction to compel men to work for their creditors who may perversely prefer to work for their wives and children, and leave honest debts unpaid." [Webster v. Hildreth, 33 Vt. 457; Seay v. Hesse, 123 Mo. 450; Gruner v. Scholz, 154 Mo. 415, and cases cited.] The judgment of the circuit court ought to be affirmed, and it is so ordered. All concur.